**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | |
| ) | **Case No. 15-9091** |
| **ERNEST NJAGI MUTHARA,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM AND ORDER

Plaintiff United States of America brought this denaturalization action, seeking to revoke and set aside defendant Ernest Njagi Muthara's citizenship and cancel his Certificate of Naturalization. The court conducted a bench trial in May 2017. The court is now prepared to issue its Findings of Fact and Conclusions of law.

## FINDINGS OF FACT

**I.  Factual Background**

   *A.  Defendant's Background and Lawful Permanent Resident Status*

   1.  <u>1970</u>:  Defendant was born in Kenya.

   2.  <u>1994–95</u>:  Defendant married a citizen of Kenya, Rahab Wanjiku Kamau, and had a son with her there.

   3.  <u>January 4, 2003</u>:  Defendant married Quiana Marie Williams, a United States citizen, in Kansas City, Missouri.  At the time of defendant's marriage to Williams and throughout all relevant periods of defendant's immigration proceedings, defendant remained married to Kamau.

   4.  <u>April 3, 2003</u>:  Williams filed Form I-130 (Petition for Alien Relative) on behalf of defendant to classify him as her spouse for immigration purposes.  In that form, Williams indicated

-1-

that defendant had previously been married to Kamau, but that the marriage had ended on November 12, 2001.  Defendant also submitted a fraudulent Kenyan divorce decree in support of Form I-130.  At the time defendant submitted the divorce decree, he knew it was fraudulent.

5. <u>April 3, 2003</u>:  Defendant concurrently filed Form I-485 (Application to Register Permanent Residence or Adjust Status), to become a conditional lawful permanent United States resident based on his marriage.  On that form, defendant indicated under penalty of perjury that he had not "by fraud or willful misrepresentation of a material fact, ever sought to procure, or procured, a visa, other documentation, entry into the U.S., or any other immigration benefit."  In connection with this form, defendant submitted a Form G-325A (Biographic Information Sheet).  There, defendant listed Kamau as a former wife, indicating that the marriage was terminated on November 12, 2001.

6. <u>August 28, 2003</u>:  A United States Citizenship and Immigration Services ("USCIS") officer interviewed defendant under oath regarding his I-485 application.  The officer asked defendant whether defendant had ever, by fraud or willful misrepresentation of a material fact, sought to procure, or procured, a visa, other documentation, entry into the United States, or any other immigration benefit.  Defendant said no, knowing that all of the information he provided and documents he produced in connection with the Forms I-130 and I-485 were submitted to prove that he was eligible to become a permanent resident.

7. <u>September 18, 2003</u>:  USCIS approved Williams's I-130 petition, classifying defendant as Williams's spouse.  Also on that date, USCIS admitted defendant to the United States as a conditional lawful permanent resident, based on the approved I-130 petition, the information supplied by defendant in his I-485 application, and defendant's sworn testimony from his interview.

8. <u>October 12, 2005</u>:  Defendant was admitted to the United States as a permanent resident.  This was based on Williams's approved I-130 petition and defendant's approved I-485

petition, as well as information received in a Petition to Remove Conditions on Residence (filed by defendant in August 2005) and an interview associated with that petition.

### B.    *Defendant's Daughter with Sarah Njoroge*

9.     August 2006:  Defendant became romantically involved with Sarah Njoroge.

10.    Early 2007:  Njoroge told defendant that she was pregnant with defendant's child.

11.    February 2007:  Williams learned that Njoroge was pregnant with defendant's child.

12.    August 2007:  Njoroge gave birth to a daughter, Y-W-.  Defendant was present during the birth and is listed as the father on the birth certificate.  There has never been a dispute about the paternity of Y-W-.  The birth certificate lists defendant's address (2314 W. Elizabeth Street, Olathe, Kansas 66061) as the "present residence" for Y-W-, and it does not contain a separate mailing address for the mother.  The birth of Y-W- was significant and important to defendant.

13.    After Y-W-'s birth:  Defendant "took care of" Y-W-.  He helped financially—for example, purchasing diapers and other things for Y-W-.  Five or six months after Y-W-'s birth, defendant was one hundred percent certain that she was his child.

### C.    *Defendant's Naturalization Application*

14.    November 7, 2007:  Defendant filed Form N-400 (Application for Naturalization).  The application was based on having been a lawful permanent resident for at least three years, and having been married to and living with the same U.S. citizen spouse (Williams) for at least three years.  At least four areas of inquiry on the form are significant to the court: (1) the residential addresses listed; (2) the children listed/not listed; (3) the marriages listed; and (4) whether defendant has provided false or misleading information.

**Residential Addresses:**  Defendant listed his address the same as on Y-W-'s birth certificate, and indicated that he had lived there since April 1, 2007.  Elsewhere on the application, defendant

-3-

listed the same address for Williams, but Williams lived at other addresses in Kansas City, Missouri between 2004 and 2008. While defendant also listed other addresses for himself, he has never lived at an address in Kansas City, Missouri.

**Children:**  In response to a question asking how many sons and daughters he had, defendant answered, "1." The next section of the application asks for information about all sons and daughters. There, defendant provided information only for his son born in Kenya in 1995. He did not provide any information about Y-W-, although she was born in August 2007.

**Marriages:**  Defendant indicated on the form that he had been married twice, and that the marriage to Kamau had ended by divorce on "12/11/2001." He also indicated that he had not ever been married to more than one person at the same time.

**False or Misleading Information:**  Later in the application, defendant checked that he had never "given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal." Defendant also indicated that he had not "ever lied to any U.S. government official to gain entry or admission into the United States." He signed the application under penalty of perjury.

15. April 9, 2008:  USCIS Officer Carol Sicoli orally interviewed defendant about his naturalization application. Although Officer Sicoli does not independently recall defendant's interview, she conducted approximately 1,000 immigration benefits interviews a year for ten years, and she did every naturalization interview the same way. She placed applicants under oath before every interview, and would not conduct an interview if someone refused to take the oath or affirmation. Officer Sicoli also recognized her stamp and signature on defendant's application. Again, several topics of the interview are of particular concern to the court: (1) the residential addresses of defendant

and Williams; (2) defendant's children listed/not listed; and (3) whether defendant has provided false or misleading information.

**Residential Addresses:** Officer Sicoli asked defendant to confirm the name and address of Williams. If defendant had indicated that Williams lived at a separate address, it would have impacted the adjudication of defendant's Form N-400, and Officer Sicoli would have requested additional information and evidence. If defendant had told Officer Sicoli that he and Williams did not live in the same home, Officer Sicoli likely would not have granted his naturalization application.

**Children:** During the interview, Officer Sicoli asked defendant how many sons and daughters he had, and he stated one. Again, he only provided information about his son. Had defendant revealed that he had a child out of wedlock (when applying for naturalization based on marriage), it would have been a "red flag" for Officer Sicoli. It would have been important for her to know if there was a child from another relationship, because that might have caused Officer Sicoli to ask questions about defendant's marriage. If evidence had shown that defendant fathered a child out of wedlock, Officer Sicoli would "more likely than not . . . have denied the application."

**False or Misleading Information:** Officer Sicoli later asked defendant whether he had ever provided false or misleading information to any U.S. government official while applying for any immigration benefit, and defendant confirmed his written answer of "no." She also asked whether defendant had ever lied to any U.S. government official to gain entry or admission into the United States, and defendant confirmed his written answer of "no." At the end of the interview, defendant reviewed his application, had the opportunity to make corrections, and signed the application under penalty of perjury.

16.     April 9, 2008: USCIS approved defendant's naturalization application, based on defendant's status as a lawful permanent resident, the information and documentation defendant

provided in his N-400 application, and defendant's sworn testimony during his naturalization interview.

17. July 25, 2008: Defendant became a naturalized United States citizen.

18. December 6, 2008: Defendant filed for divorce from Williams.

19. May 2009: Defendant married Njoroge.

20. Additional Factual Findings Relevant to the Court's Decision:

**Naturalization Application:** Defendant's naturalization application was important to him, he completed it himself, and his answers came from himself. Defendant knew the answers on his naturalization application were important, and he knew it was important to tell the truth and be accurate in his naturalization application. Defendant knew that his naturalization application was going to government officials, who were going to read and review it. Defendant further knew when he was completing his naturalization application that he would be interviewed about it by a government official. Defendant knew that government officials were going to rely on the information that he put in his naturalization application. And he read through his naturalization application before he signed it.

**Naturalization Interview:** The naturalization interview process itself is formal and standardized, and defendant's naturalization interview was a formal interview that occurred in a government building. Defendant knew he was being interviewed by a government official. Defendant knew that he was required to tell the truth during his naturalization interview. And defendant knew the answers he provided during his naturalization interview would be used to adjudicate his naturalization application.

**Defendant's Motivation:** Defendant provided the information on, and in connection with, his application because he wanted to become a United States citizen.

**CONCLUSIONS OF LAW**

**II.     Legal Standards - Denaturalization**

The government may seek denaturalization when a naturalized citizen either: (1) illegally procured naturalization; or (2) procured naturalization by concealment of material facts or by willful misrepresentation.  8 U.S.C. § 1451(a).  To prevail under the first avenue, the government must show that the individual was statutorily ineligible to naturalize when he did so.  *See Federenko v. United States*, 449 U.S. 490, 506 (1981).  The second way the government may prevail is by showing that the individual procured naturalization by either concealment or misrepresentation, if the concealment or misrepresentation was willful, and if the fact at issue was material.  *Kungys v. United States*, 485 U.S. 759, 767 (1988) (citing *Federenko*, 440 U.S. at 507, n.28).  The government must "prove its charges in such cases by clear, unequivocal and convincing evidence which does not leave the issue in doubt."  *Klapprott v. United States*, 335 U.S. 601, 612 (1949).  When a court determines that the government has met its burden, it has no discretion to excuse the conduct.  *Federenko*, 449 U.S. at 517.  A judgment of denaturalization is required.

**III.    Discussion**

   *A.     Count I:  Illegal Procurement of United States Citizenship Based on Failure to be Admitted for Lawful Permanent Residence*

United States citizenship is illegally procured when the naturalized citizen failed to comply with any congressionally-imposed prerequisite for naturalization.  *See Fedorenko*, 449 U.S. at 506.  To be naturalized, an applicant must have been lawfully admitted to the United States for permanent residence.  *See* 8 U.S.C. § 1429.  To have been "lawfully admitted for permanent residence," an applicant must show that he has been "lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws. . . ."  *Id.* § 1101(a)(20).  An

immigrant who, at the time of application for admission, is not in possession of a valid unexpired visa, reentry permit, or other valid entry document is inadmissible. *Id.* § 1182(a)(7)(A)(i).

Moreover, an applicant is inadmissible if he seeks to procure a visa, other documentation, or admission into the United States by fraud or by willfully misrepresenting a material fact. *Id.* § 1182(a)(6)(C)(i). A misrepresentation is "willful" if it was "deliberate and voluntary." *See United States v. Hirani*, 824 F.3d 741, 749 (8th Cir. 2016). Deliberate and voluntary requires only knowledge of the falsity of the representation and does not require an intent to deceive. *Id.*

### 1. Invalidity of Marriage to Williams

Defendant sought to become a lawful permanent resident based on his marriage to Williams, a United States citizen. But at the time defendant filed his I-485, defendant remained married to Kamau in Kenya. Defendant's subsequent marriage to Williams was therefore invalid and could not lawfully confer any immigration status. Without a valid marriage to a United States citizen, defendant was not eligible for lawful permanent residence based on the marriage, and his lawful permanent resident documents were not valid. 8 U.S.C. § 1101(a)(20). Without being lawfully admitted as a permanent resident, defendant was inadmissible under 8 U.S.C. § 1182(a)(7)(A)(i) and was ineligible for naturalization. *Id.* § 1427(a)(1). Defendant therefore illegally procured his citizenship, and this court must revoke his citizenship. *Id.* § 1451(a).

### 2. Fraud and Willful Misrepresentation

The court next determines that defendant procured his lawful permanent residence through fraud and willful misrepresentation of material facts by representing on his I-485 application and during his adjustment of status interview that he and Kamau were legally divorced, and by submitting a false divorce decree in support. Defendant remained married to Kamau, and no divorce decree

existed. Defendant made these representations voluntarily and deliberately, knowing that they were false and misleading. This constituted willful misrepresentation.

Defendant's misrepresentations were material to his adjustment of status. Remaining married to Kamau would have had a natural tendency to influence USCIS's decision whether to approve defendant's I-485 application and grant him lawful permanent resident status. Had this information been revealed, USCIS would have denied defendant's I-485 application.

Defendant therefore was not lawfully admitted as a permanent resident because he procured his lawful permanent resident status through fraud and willful misrepresentation of material facts and was inadmissible under 8 U.S.C. § 1182(a)(6)(C)(i). Without lawful permanent residence, defendant was ineligible for naturalization. *Id.* § 1427(a)(1). Defendant illegally procured his citizenship, and on this additional basis, the court must revoke his citizenship. *Id.* § 1451(a).

### B.     *Count II: Illegal Procurement of United States Citizenship Based on Failure to Live in Marital Union with United States Citizen Spouse*

When an applicant for naturalization is relying on marriage to a United States citizen, that applicant must show that he has been living in "marital union" with his United States citizen spouse during the three years immediately preceding the date of filing his naturalization application. *Id.* § 1430(a); 8 C.F.R. § 319.1(a)(3). To satisfy the "marital union" requirement, the applicant must show that he "actually resides" with his United States citizen spouse. 8 C.F.R. § 319.1(b)(1). Courts that have interpreted "living in marital union" have concluded that the applicant must reside with his or her citizen spouse. *See United States v. Moses*, 94 F.3d 182, 185 (5th Cir. 1996) (affording *Chevron* deference for INS's interpretation of 8 C.F.R. § 319.1(b)(1) that a couple must actually reside together to take advantage of the "citizen spouse" provision for citizenship); *United States v. Maduno*, 40 F.3d

1212, 1216–17 (11th Cir. 1994). And the applicant bears the burden to establish these requirements. 8 C.F.R. § 319.1(b)(1).

Defendant was only eligible to naturalize based on his marriage to Williams if he had been living in marital union (i.e., "actually resided") with her from November 7, 2004 to November 7, 2007. But defendant and Williams did not "actually reside" together for the full three-year period. Defendant misrepresented on his N-400 application that he and Williams were residing together at 2314 W. Elizabeth Street, Olathe, Kansas 66061, and had both been residing at that address since April 1, 2007. Williams, however, was living in Kansas City, Missouri during that time. And Y-W's birth certificate indicates that in August 2007, Njoroge was residing with defendant at the Elizabeth Street address. Additionally, defendant and Williams did not live together at locations prior to the Elizabeth Street address and during the requisite three-year "marital union" period. Defendant represented on his N-400 application that between February 13, 2006, and March 30, 2007, he lived at 12005 Willow Lane, Overland Park, Kansas. But again, Williams was living in Kansas City, Missouri during that time.

Because defendant and Williams did not "actually reside" together and because defendant was living with Njoroge, defendant did not live in marital union with Williams during the full three-year period. Because defendant did not live in marital union with his United States citizen spouse for the three years immediately preceding his naturalization application, he was ineligible for naturalization under 8 U.S.C. § 1430(a). Again, defendant illegally procured his citizenship, and this court must revoke his citizenship. 8 U.S.C. § 1451(a).

### C. Count III: Illegal Procurement of United States Citizenship Based on Lack of Good Moral Character Through False Testimony

A naturalization applicant must meet a "good moral character" requirement. *Id.* § 1427(a)(3). An applicant is statutorily barred from showing that he is a person of good moral character if he has

given false testimony, under oath, for the purpose of receiving an immigration benefit. *Id.* § 1101(f)(6). The required statutory period for good moral character, when the applicant's naturalization application is based upon his marriage to a United States citizen, is three years. *See id.* § 1430(a). This includes the period between the examination and the administration of the oath of allegiance. 8 C.F.R. § 316.10(a)(1). Here, defendant must demonstrate "good moral character" between November 7, 2004 and the date he took the oath of citizenship—July 25, 2008.

During defendant's April 9, 2008 naturalization interview, defendant provided false testimony for the purpose of obtaining an immigration benefit several times: (1) when he swore under oath that his answer to part 9, section A of his N-400 application was true, and that he had only one child (his son); (2) when he swore under oath that his answer to part 10, section D, question 23 of his N-400 application was true, and that he had never given false or misleading information while applying for an immigration benefit; and (3) when he swore under oath that his answer to part 10, section D, question 24 of his N-400 application was true, and that he had never lied to a U.S. government official to gain admission into the United States.

Because defendant provided false testimony under oath for the purpose of obtaining naturalization, he was statutorily barred from showing that he had the good moral character necessary to become a naturalized United States citizen. 8 U.S.C. § 1101(f)(6). This made defendant ineligible for naturalization. *Id.* § 1427(a)(3). And again, defendant illegally procured his citizenship and this court must revoke that citizenship. *Id.* § 1451(a).

### D.    *Count IV: Illegal Procurement of United States Citizenship Based on Concealment of Material Facts and Willful Misrepresentation*

To revoke citizenship based on willful misrepresentation and concealment, the evidence must demonstrate that (1) the naturalized citizen misrepresented or concealed a fact; (2) the

-11-

misrepresentation or concealment was willful; (3) the fact was material; and (4) the naturalized citizen procured citizenship as a result of the misrepresentation or concealment. *Kungys*, 485 U.S. at 767. The evidence here satisfies all of these elements.

First, defendant misrepresented or concealed facts. He concealed that he had a second child. Defendant also misrepresented that he and Kamau had been legally divorced and submitted a falsified divorce decree. And defendant also misrepresented that, at the time he submitted his naturalization application, he and Williams were living in the same home.

Second, these misrepresentations or concealments were willful. Under the Immigration and Nationality Act, "[p]roof of an intent to deceive is not required; rather, knowledge of the falsity of the representation is sufficient." *See Witter v. INS*, 113 F.3d 549, 554 (5th Cir. 1997) (citations omitted). Defendant was well aware of the existence of his daughter. He attended her birth and consented to be listed on the birth certificate as her father. He took responsibility for her financially and supported her. The evidence demonstrates that defendant knew that failing to acknowledge a second child was dishonest. Likewise, defendant knew the Kenyan divorce decree was false, and knew that he was not living in the same home with Williams.

Third, the facts at issue were material. A misrepresentation or concealment is material if the misrepresentation would have had the "natural tendency to influence" the naturalization decision. *See Kungys*, 485 U.S. at 771–72; *see also So Yen Lee v. INS*, No. 94-9508, 1994 WL 651990, at *1 (10th Cir. Nov. 18, 1994). In this case, the information about defendant's daughter was material because he was seeking naturalization based on his marriage. The daughter was conceived outside of his marriage—during an extramarital affair that happened while defendant was required to prove that he was living in marital union with his wife. Officer Sicoli indicated that had she known that defendant had a daughter from another relationship, it would have been a "red flag." Moreover, the use of

-12-

defendant's address on the birth certificate would have raised questions about whether defendant was still living with his wife, as required for naturalization. Likewise, the facts that defendant's marriage to Kamau was not properly terminated and defendant was not living with Williams were material. The facts that defendant concealed had a natural tendency to influence the naturalization decision.

Fourth, "procurement" was present; defendant obtained naturalization as a result of the misrepresented or concealed facts. To determine whether defendant procured his naturalization based on the misrepresentations and concealment, the court asks whether it is "fair to infer that the citizen was actually ineligible" for naturalization. *See United States v. Latchin*, 554 F.3d 709, 714 (7th Cir. 2009); *United States v. Mensah*, 737 F.3d 789, 809 (1st Cir. 2013). The inference in this case is fair because defendant's undisclosed child as a result of an extramarital relationship was directly relevant to his naturalization application based on his marriage, as was the status of defendant's first marriage and whether defendant was living with Williams. Because defendant procured his naturalization by willful misrepresentation and concealment of material facts, this court must revoke his citizenship under 8 U.S.C. § 1451(a).

**IT IS THEREFORE ORDERED** that judgment will be entered on all four counts in favor of plaintiff and against defendant. The court directs the government to submit a proposed judgment within seven days of the date of this order.

Dated this 2nd day of January, 2018, at Kansas City, Kansas.

s/ Carlos Murguia  
**CARLOS MURGUIA**  
**United States District Judge**